**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTOPHER R. GRAHAM, SR., | : | Civil No. 3:20-cv-595 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| E. BRADLEY, *et al.*, | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM**

Plaintiff Christopher Graham ("Graham"), a former inmate[1] who was housed at all

relevant times at the United States Penitentiary, Canaan, in White Deer, Pennsylvania

("USP-Canaan"), commenced this action pursuant to *Bivens v. Six Unknown Fed. Narcotics

Agents*, 403 U.S. 388 (1971).[2]  (Doc. 1).  Named as Defendants are Warden Bradley,

Associate Warden Eckert, Correctional Officer Sykes, Dr. Sommer, Dr. Mowatt, Certified

Physician Assistant ("PA-C") Carey, PA-C Walters, and PA-C Kaiser.  (*Id.*).  Presently

pending before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b) or, in the alternative, for summary judgment pursuant to Federal Rule of

Civil Procedure 56.  (Doc. 20).  Graham failed to respond to the motion and the time for

---

[1]    Graham was released from federal custody on June 9, 2020.  (*See* Doc. 24 ¶¶ 7, 187).

[2]    In *Bivens*, the United States Supreme Court created a federal tort counterpart to the remedy created by 42 U.S.C. § 1983 as it applies to federal officers.

responding has now passed.[3]  Therefore, the motion is deemed unopposed and ripe for

resolution.  For the reasons set forth below, the Court will grant Defendants' motion.

## I.   Rule 12(b)(6) Motion

### A.   Legal Standard

A complaint must be dismissed under Fed. R. Civ. P. 12(b)(6) if it does not allege

"enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  The plaintiff must

aver "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct.

1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic

recitation of the elements of a cause of action will not do.'"  *DelRio-Mocci v. Connolly Prop.*

*Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555).  In other words,

"[f]actual allegations must be enough to raise a right to relief above the speculative level."

*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013)

(internal citations and quotation marks omitted).  A court "take[s] as true all the factual

---

[3]    Graham was directed to file a brief in opposition to Defendants' motion and was admonished
that failure to file an opposition brief would result in Defendants' motion being deemed unopposed. (Docs.
26, 28) (citing M.D. PA. LOCAL RULE OF COURT 7.6).  (*See also* Doc. 4, Standing Practice Order in Pro Se
Plaintiff Cases, at 2).

allegations in the Complaint and the reasonable inferences that can be drawn from those

facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v.*

*Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation

marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to
> determine the sufficiency of a complaint:  First, the court must take note of the
> elements a plaintiff must plead to state a claim.  Second, the court should
> identify allegations that, because they are no more than conclusions, are not
> entitled to the assumption of truth.  Finally, where there are well-pleaded
> factual allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged - but it has not show[n] - that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks

omitted).  This "plausibility" determination will be a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court

must permit a curative amendment unless such an amendment would be inequitable or

futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a
> defendant moves to dismiss it, unless the district court finds that amendment

3

would be inequitable or futile, the court must inform the plaintiff that he or she
has leave to amend the complaint within a set period of time.

*Id.*

### B.   Allegations of the Complaint

On September 28, 2016, Graham arrived at USP-Canaan and underwent an intake
examination by Dr. Sommer. (Doc. 1, p. 5). He informed Dr. Sommer that he had a
preexisting hip condition and continued to experience pain. (*Id.*). Over the next year and a
half, Graham "made several visits" to the medical department due to his hip pain. (*Id.*).
Graham alleges that Defendants, Dr. Sommer, Dr. Mowatt, PA-C Carey, PA-C Walters, and
PA-C Kaiser, in their individual capacities, were deliberately indifferent to his medical needs
and negligent by failing to timely diagnose and properly treat his hip condition. (*Id.* at pp. 9-
11). He alleges that Defendants referred him for a hip replacement, but the referral was
subsequently cancelled. (*Id.*).

Graham alleges that Defendants, Warden Bradley and Associate Warden Eckert, in
their individual and official capacities, "indirectly" violated his Eighth Amendment rights. (*Id.*
at p. 9). He asserts that Defendants Bradley and Eckert approved the medical department's
request that Graham undergo hip surgery. (*Id.* at p. 11).

Graham contends that Defendant Correctional Officer Sykes violated his First
Amendment rights by planting a weapon in his cell and issuing a false incident report, in
retaliation for Graham's medically related complaints. (*Id.* at pp. 12-13, 15). Graham

4

alleges that Defendant Sykes issued a "fabricated" misconduct charging Graham with

possession of a weapon.  (*Id.* at p. 12).  After a disciplinary hearing, Graham was found

guilty of the misconduct and sanctioned to 30 days in segregation, loss of commissary,

email, and mp3, and loss of 41 days of good conduct time.  (*Id.* at pp. 12-13, 15).

### C.   Discussion

#### 1.   *FTCA Medical Professional Negligence Claim*

##### a.   <u>The Defendants are Improper Parties</u>

Defendants seek dismissal of the Federal Tort Claims Act ("FTCA") claim against the

individually named Defendants on the ground that the United States is the only proper party

under the FTCA, and the United States is not a Defendant in this action.  (Doc. 25, pp. 18-

19).  The United States Court of Appeals for the Third Circuit has set forth the following:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on
> claims against the United States." 28 U.S.C. § 1346(b)(1).  As the Supreme
> Court has stated, "[t]he United States, as sovereign, is immune from suit save
> as it consents to be sued, and the terms of its consent to be sued in any court
> define that court's jurisdiction to entertain the suit."  *United States v.
> Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) (citations
> omitted).  Thus, FTCA plaintiffs must meet the criteria of § 1346(b)(1) before
> a district court may exercise jurisdiction.
>
> In particular, § 1346(b)(1) lists six threshold requirements that a plaintiff's
> claim must satisfy to confer jurisdiction.  A claim must be made
>
> > "[1] against the United States, [2] for money damages, ... [3] for
> > injury or loss of property, or personal injury or death [4] caused
> > by the negligent or wrongful act or omission of any employee of
> > the Government [5] while acting within the scope of his office or

> employment, [6] under circumstances where the United States,
> if a private person, would be liable to the claimant in
> accordance with the law of the place where the act or omission
> occurred."
>
> *FDIC v. Meyer*, 510 U.S. 471, 477, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)
> (quoting 28 U.S.C. § 1346(b)(1)) (alterations in original).  The cause of action
> in an FTCA claim, on the other hand, must come from state tort law.  *Id.* at
> 478, 114 S.Ct. 996 (describing state tort law as "the source of substantive
> liability under the FTCA").

*CNA v. United States*, 535 F.3d 132, 140-41 (3d Cir. 2008), as amended (Sept. 29, 2008).

Because the United States is the only proper FTCA party, and Graham did not name the

United States as a Defendant in this action, the FTCA claim against the Defendants will be

dismissed.

### b.   Failure to File a Certificate of Merit

Defendants next argue that, to the extent Graham intended to assert an FTCA claim

against the United States, this claim must be dismissed based on Graham's failure to timely

file a certificate of merit ("COM"), as required by Pennsylvania Rule of Civil Procedure

1042.3.  (Doc. 25, pp. 19-20).  Rule 1042.3 requires a plaintiff alleging professional

negligence to file a COM within sixty (60) days of filing the complaint.  PA. R. CIV. P. 1042.3.

The certificate must include one of the following: a written attestation by "an appropriate

licensed professional" that there is a "reasonable probability that the care, skill or knowledge

exercised or exhibited" by the defendant "fell below acceptable professional standards," and

that this was the cause of the plaintiff's injuries; a statement that the claim against the

defendant is based only on the professional negligence of those for whom the defendant is

responsible; or a statement that expert testimony is unnecessary for the plaintiff's claim to

proceed.  PA. R. CIV. P. 1042.3(a)(1)-(3).  Failure to file a certificate of merit is fatal to a

plaintiff's claim.  PA. R. CIV. P. 1042.7.  A defendant seeking to dismiss for want of a

certificate must first file written notice of their intent to do so, no sooner than thirty (30) days

after the complaint was filed.  PA. R. CIV. P. 1042.6(a).

     As a threshold matter, it is undisputed that Rule 1042.3 applies to this action.  The

Third Circuit has determined that the certificate of merit requirement is a substantive rule of

Pennsylvania law, applicable to federal court actions under *Erie Railroad Co. v. Tompkins*,

304 U.S. 64, 78 (1938).  *See Liggon-Redding v. Estate of Robert Sugarman*, 659 F.3d 258

(3d Cir. 2011); *Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008).

     Pursuant to Pennsylvania law, "a court may consider two equitable exceptions when

a plaintiff has improperly failed to file a COM: whether the plaintiff has substantially

complied with Rule 1042.3 and whether the plaintiff has offered a reasonable explanation or

legitimate excuse for failure to comply."  *Ramos v. Quien*, 631 F. Supp. 2d 601, 611 (E.D.

Pa. 2008) (citing *Womer v. Hilliker*, 908 A.2d 269, 276, 279 (Pa. 2006)).  Federal courts

have since applied these equitable considerations to determine if a plaintiff who fails to

timely file a certificate of merit may be relieved from the requirement if he provides a

reasonable explanation or legitimate excuse.  *See Perez v. Griffin*, 304 F. App'x 72, 74 (3d

Cir. 2008) (observing that "failure to comply with Rule 1042.3 is not fatal to claims of professional liability if the Plaintiff can show 'reasonable excuse' for the noncompliance") (quoting *Womer*, 908 A.2d at 279-80)).

In the instant action, Graham was required to file a certificate of merit producing expert testimony that his medical treatment deviated from acceptable medical standards, and to show that the deviation was the proximate cause of any injuries. Graham's medical claims are not within the knowledge of lay persons, as they relate to allegations that Defendants were negligent in providing medical care. Specifically, Graham claims that he was not provided adequate treatment for his hip condition. This claim is clearly "an integral part of the process of rendering medical treatment" which involves professional medical judgment which is beyond the realm of the lay person. *Paige v. Holtzapple*, 2009 WL 2588849, *4 (M.D. Pa. 2009) ("Where the conduct at issue constituted an integral part of rendering medical treatment, and involved diagnosis, care, and treatment by a licensed professional, . . . the action is one that is characterized as a professional negligence action requiring expert testimony."). It cannot be said that a decision of whether, when or what type of treatment should be provided "is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons." *Hightower-Warren v. Silk*, 698 A.2d 52, 54 n.1 (Pa. 1997). Accordingly, a certificate of merit is required for any professional negligence claim.

Graham filed his complaint on or about March 30, 2020.  (Doc. 1).  On June 23, 2020, Defendants provided notice to Graham that they intended to seek dismissal of the negligence cause of action for failure to file a certificate of merit.  (Doc. 19).  Graham did not file the requisite certificate of merit and did not request an extension of time in which to do so.  Furthermore, Graham has failed to oppose Defendants' motion and thus failed to show a reasonable explanation or legitimate excuse for failure to timely file a certificate of merit.  Consequently, the Court will grant Defendants' motion to dismiss any potential professional negligence claim against the United States based on Graham's failure to file a certificate of merit.

### 2.    *Claims against Bradley and Eckert in their Official Capacities*

Defendants seek dismissal of the claims against Defendants Bradley and Eckert in their official capacity, based on sovereign immunity.  (Doc. 25, pp. 20-21).

The doctrine of sovereign immunity bars suits against the United States or its agencies unless the government has waived that immunity.  *FDIC v. Meyer*, 510 U.S. 471 (1994).  The United States and its agencies have not waived immunity.  An action against prison officials in their official capacities constitutes an action against the United States.

As concerns the official capacity claims against Defendants Bradley and Eckert, sovereign immunity extends to individual officers acting in their official capacities, absent an explicit waiver.  *See Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 395 (3d Cir.

9

2012) ("Without a waiver of sovereign immunity, a court is without subject matter jurisdiction over claims against federal agencies or officials in their official capacities). *Bivens* does not waive sovereign immunity with respect to claims brought against federal employees sued in their official capacities. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72 (2001) ("If a federal prisoner in a BOP facility alleges a constitutional deprivation, he may bring a *Bivens* claim against the offending individual officer, subject to the defense of qualified immunity. The prisoner may not bring a *Bivens* claim against the officer's employer, the United States, or the BOP.").

Accordingly, Graham's official capacity claims against Defendants Bradley and Eckert are essentially claims against the United States that must be dismissed on sovereign immunity grounds. *See Brooks v. Bledsoe*, 682 F. App'x 164, 169 (3d Cir. 2017) (per curiam) ("To the extent that Brooks is suing the BOP employees in their official capacities, his claim fails as actions against prison officials in their official capacities are considered actions against the United States, and *Bivens* claims against the United States are barred by sovereign immunity, absent an explicit waiver.").

### 3. *Claims against Bradley and Eckert in their Individual Capacities*

Defendants next seek to dismiss the claims against Defendants Bradley and Eckert in their individual capacities based on a lack of personal involvement. (Doc. 25, pp. 21-23).

Individual liability will be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct.  *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)).  Liability "cannot be predicated solely on the operation of respondeat superior." *Id.*  In other words, defendants in Section 1983 civil rights actions "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence." *Atkinson v. Taylor*, 316 F.3d 257, 271 (3d Cir. 2003); *Rode*, 845 F.2d at 1207-08.  A plaintiff must establish the particulars of conduct, time, place, and the person responsible. *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at 1207-08.  When a plaintiff merely hypothesizes that an individual defendant may have had knowledge of, or personal involvement in, the deprivation of his or her rights, individual liability will not follow. *Atkinson*, 316 F.3d at 271; *Rode*, 845 F.2d at 1207-08.  A claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred.  *See Rode*, 845 F.2d at 1207.

With respect to Bradley and Eckert's supervisory roles as Warden and Assistant Warden, "there are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in

violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had

knowledge of and acquiesced in their subordinates' violations." *Santiago v. Warminster*

*Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010) (quotation and alteration marks omitted).

Completely absent from the complaint are allegations that Defendant Bradley and Eckert

established and maintained a policy, practice or custom which directly caused the

constitutional harm, or that they participated in violating Graham's rights, directed others to

violate them, or acquiesced in any unconstitutional conduct by their subordinates. Indeed,

Graham acknowledges that Defendants Bradley and Eckert only "indirectly" violated his

rights. (Doc. 1, p. 9).

Additionally, for purposes of Eighth Amendment medical claims, nonmedical staff

may not be "considered deliberately indifferent simply because they failed to respond

directly to the medical complaints of a prisoner who was already being treated by the prison

doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). Courts have repeatedly held

that, absent some reason to believe that prison medical staff are mistreating prisoners, non-

medical corrections staff who refer inmate medical complaints to physicians may not be held

personally liable for medically based Eighth Amendment claims. *See, e.g.*, *Spruill v. Gillis*,

372 F.3d 218, 236-37 (3d Cir. 2004) (citing *Durmer*, 991 F.2d at 69); *Garvey v. Martinez*,

No. 08- 2217, 2010 WL 569852, at *6-7 (M.D. Pa. 2010); *Hodge v. United States*, No. 06-

1622, 2007 WL 2571938, at *5-6 (M.D. Pa. 2007). Warden Bradley and Assistant Warden

12

Eckert are not trained members of the medical staff subject to liability for an Eighth Amendment claim. Because Graham was under the regular care of medical experts, the nonmedical defendants were justified in believing that he was in capable hands. *See* *Spruill*, 372 F.3d at 236; *Durmer*, 991 F.2d at 69.

Based on the above, Defendants' motion to dismiss the claims against Bradley and Eckert in their individual capacities will be granted based on a lack of personal involvement.

### 4. *First Amendment Retaliation Claim*

Graham sets forth a First Amendment retaliation claim against Defendant Sykes and alleges he was engaged in protected speech when making complaints to Health Services staff.

In *Bivens*, the Supreme Court recognized that a plaintiff may bring a damages claim against a federal official for violation of the plaintiff's Fourth Amendment right to be free from unreasonable searches, even though no federal statute authorized such a claim. *Bivens*, 403 U.S. at 397. Post-*Bivens*, the Supreme Court has only recognized an implied damages remedy against a federal official in two other circumstances: under the Fifth Amendment Due Process Clause for gender discrimination, *Davis v. Passman*, 442 U.S. 228, 245 (1979), and under the Eighth Amendment's prohibition on cruel and unusual punishment for inadequate medical care, *Carlson v. Green*, 446 U.S. 14, 18-23 (1980).

In the absence of Supreme Court extensions of the implied damages remedy under *Bivens*, lower federal courts had the power to extend *Bivens* to new fact situations as appropriate. *Mack v. Yost*, 968 F.3d 311, 319 (3d Cir. 2020). However, in *Ziglar v. Abbasi*, 582 U.S. ____, 137 S. Ct. 1843 (2017), the Supreme Court cautioned that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity" and that decisions of whether to recognize new causes of action should generally be left to Congress. *Id.* at 1857 (quoting *Iqbal*, 556 U.S. at 675). *Ziglar* is a watershed case in prisoner litigation, and it must be followed to the exclusion of prior court of appeals precedent.

*Ziglar* set forth a two-part test to determine whether a *Bivens* claim may proceed. *Id.* First, courts must determine whether the case presents a new *Bivens* context. *See id*. at 1859. "If the case is different in a meaningful way from previous *Bivens* cases decided by th[e] [Supreme] Court, then the context is new." *Id.* Second, if the case presents a new context, a court must then consider whether any alternative remedies exist. *Id.* at 1859-60. Even absent alternative remedies, a court must also consider whether special factors counsel against extending the *Bivens* remedy. *Id.*

Here, it is clear that Graham's claim presents a new context to which *Bivens* has never been extended. Graham alleges that Defendant Sykes retaliated against him in violation of the First Amendment. The Supreme Court has never recognized a *Bivens* cause of action under this theory. Indeed, the United States Court of Appeals for the Third

Circuit has repeatedly held that *Bivens* may not be extended to First Amendment retaliation claims in the prison context.  *See Bistrian v. Levi*, 912 F.3d 79, 96 (3d Cir. 2018) ("[T]he retaliation claim is not a recognized *Bivens* remedy[.]"); *Vanderklok v. United States*, 868 F.3d 189, 198 (3d Cir. 2017) ("The Supreme Court has never implied a *Bivens* action under any clause of the First Amendment."); *Watlington on behalf of FCI Schuylkill African Am. Inmates v. Reigel*, 723 F. App'x 137, 139-40 (3d Cir. 2018) (affirming the dismissal of a First Amendment retaliation claim brought by a federal prisoner against correctional staff); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (The Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants" beyond alleged violations by federal actors of the Fourth Amendment, Fifth Amendment Due Process Clause, or Eighth Amendment Cruel and Unusual Punishments Clause).

Because Graham's claim presents a new context, the Court must determine whether there are any special factors that counsel hesitation in extending *Bivens*.  *Mack*, 968 F.3d at 317.  There may be many special factors, but two are "'particularly weighty': the availability of an alternative remedial structure and separation-of-powers concerns."  *Id.* at 320 (quoting *Bistrian*, 912 F.3d at 90).

While housed at USP-Canaan, Graham had access to the BOP administrative remedy process.  *See id.* at 320-21 (finding that the BOP's grievance process provided

alternative remedial structure).  "Although the alternative remedy would not provide

[Graham] with money damages for the constitutional violation incurred," it could still provide

injunctive relief.  *Id.* at 321.  Additionally, separation of powers concerns caution against

expanding *Bivens* to this case.  Graham alleges that Defendant Sykes retaliated against him

for making complaints regarding inadequate medical care by planting a weapon in his cell

and charging him with a "fabricated" misconduct.  (Doc. 1, p. 12).  Graham appeared before

a hearing examiner and was ultimately found guilty of the infraction through the institution's

disciplinary hearing process, a determination that is clearly delegated to the BOP.  *See id.*

at 321-22 (noting that courts "have afforded a level of deference to the decision making of

prison officials" and should proceed with caution before extending *Bivens* to decisions that

have been delegated to the BOP).

The Court finds that Graham's First Amendment retaliation claim presents a new

context to which *Bivens* has not previously been extended, and special factors counsel

against extending *Bivens* to this new context.  As such, the Court declines to extend *Bivens*

to this claim.

### D.    Leave to Amend

When a complaint fails to present a *prima facie* case of liability, district courts must

generally grant leave to amend before dismissing the complaint.  *See Grayson v. Mayview*

*State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d

Cir. 2000).  Specifically, the Third Circuit Court of Appeals has admonished that when a

complaint is subject to dismissal for failure to state a claim, courts should liberally grant

leave to amend "unless such an amendment would be inequitable or futile." *Phillips*, 515

F.3d at 245 (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004)).  The above claims

set forth by Graham are legally and factually flawed.  The Court concludes that granting

Graham leave to amend would be futile as he has failed to oppose the motion to dismiss

despite being afforded an extension of time to do so.

III.   <u>Rule 56 Motion</u>

    A.   **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact."  FED. R. CIV. P. 56(a).  "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once such a showing has been made, the non-moving

party must offer specific facts contradicting those averred by the movant to establish a

genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists.  *Anderson*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  FED. R. CIV. P. 56(c)(3).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of

material fact.  When opposing parties tell two different stories, one of which is
blatantly contradicted by the record, so that no reasonable jury could believe
it, a court should not adopt that version of the facts for purposes of ruling on a
motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

### B.    Statement of Undisputed Facts[4]

On September 16, 2016, Graham entered into federal custody and underwent a

medical intake screening.  (Doc. 24, Statement of Material Facts, ¶ 14).  Graham's only

complaint during his September 16, 2016 medical intake screening was lower back pain.

(*Id.* at ¶ 15).  Graham was prescribed ibuprofen and acetaminophen.  (*Id.* at ¶ 16).

Graham received medical treatment at USP-Canaan from September 28, 2016

through May 5, 2020.  (*Id.* at ¶ 12).  Graham arrived at USP-Canaan on September 28,

2016.  (*Id.* at ¶ 17).  Graham underwent another medical intake screening on September 28,

2016, during which he denied any painful condition and made no complaints, and his

ibuprofen prescription was continued.  (*Id.* at ¶ 18).

---

[4]    Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil
Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered
paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF
COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material
facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying
genuine issues for trial.  *See id.*  Unless otherwise noted, the factual background herein derives from the
Defendants' Rule 56.1 statement of material facts.  (Doc. 24).  Graham did not file a response to
Defendants' statement of material facts.  The Court accordingly deems the facts set forth by Defendants to
be undisputed.  *See* LOCAL RULE OF COURT 56.1.  (*See also* Doc. 26 ¶ 2; Doc. 28 ¶ 3) (advising Graham
that failure to file a responsive statement of material facts would result in the facts set forth in Defendants'
statement of material facts being deemed admitted).

On October 13, 2016, Graham underwent a History and Physical exam performed by PA-C Carey. (*Id.* at ¶ 19). Graham denied any "current painful condition", and it was observed that had full strength and range of motion in his bilateral upper and lower extremities. (*Id.* at ¶¶ 20, 21). During this visit, Graham reported a 4-year history of chronic left hip pain without injury, and a history of being treated for bursitis, which is inflammation of tissue surrounding joints. (*Id.* at ¶¶ 22, 23). PA-C Carey ordered an x-ray of Graham's left hip. (*Id.* at ¶ 24). Graham underwent the left hip x-ray on October 19, 2016. (*Id.* at ¶ 25). The 2016 x-ray was negative for acute fracture or soft tissue abnormality but revealed "slight left-sided acetabular dysplasia [with] minimal joint space narrowing," i.e., a congenital shallow hip socket that can cause the hip joint to wear irregularly over time and result in osteoarthritis. (*Id.* at ¶ 26). Recommended treatment for acetabular dysplasia includes non-steroidal inflammatory medications ("NSAIDs") as needed. (*Id.* at ¶ 27). Graham was already prescribed ibuprofen, which is an NSAID. (*Id.* at ¶ 28).

On March 1, 2017, Graham injured his left knee while playing basketball. (*Id.* at ¶ 29). On March 2, 2017, PA-C Kaiser evaluated Graham and Graham did not report any hip pain. (*Id.* at ¶¶ 30, 31). PA-C Kaiser diagnosed a knee sprain, prescribed 600mg ibuprofen 3 times per day for 7 days, and instructed Graham to use an ACE bandage and follow-up in one week. (*Id.* at ¶¶ 32, 33). Graham did not fill his ibuprofen prescription. (*Id.* at ¶ 34).

On March 8, 2017, PA-C Kaiser evaluated Graham for his follow-up visit and Graham did not report any hip pain. (*Id.* at ¶¶ 35, 36). Graham's examination did not change, and PA-C Kaiser ordered a knee x-ray to be completed March 16, 2017 and instructed Graham to use a warm compress every 4 hours. (*Id.* at ¶ 37). The knee x-ray was negative for a fracture but positive for evidence of a bad sprain. (*Id.* at ¶ 40).

On April 7, 2017, PA-C Kaiser continued ibuprofen because Graham complained of ongoing knee pain. (*Id.* at ¶ 41). Graham was scheduled for a follow-up evaluation May 8, 2017, but he failed to show up for the appointment. (*Id.* at ¶¶ 42, 43).

On May 25, 2017, Graham sustained a left ring finger abrasion while working with a food compactor. (*Id.* at ¶ 42). PA-C Kaiser evaluated Graham that day and Graham did not complain of any hip pain. (*Id.* at ¶¶ 43, 44). PA-C Kaiser diagnosed a superficial abrasion of the medial aspect of Graham's fourth finger. (*Id.* at ¶ 47). PA-C Kaiser cleaned the abrasion and applied a band aid. (*Id.* at ¶ 48).

On September 11, 2017, Graham reported to PA-C Kaiser that he was experiencing hip pain. (*Id.* at ¶ 49). PA-C Carey noted that Graham had been treated for hip pain over six months ago. (*Id.* at ¶ 50). PA-C Carey reviewed Graham's commissary purchases for the previous five months, which revealed Graham had not filled his prescription for NSAIDs since July 2017. (*Id.* at ¶ 51). PA-C Carey advised Graham to take his NSAIDs, restrict his recreation activities for 6 weeks, and request a follow-up if there was no improvement. (*Id.*

at ¶ 52).  Less than 3 weeks later, Graham submitted a sick call for left hip pain and to

request an MRI.  (*Id.* at ¶ 53).  On September 29, 2017, PA-C Carey evaluated Graham.

(*Id.* at ¶ 54).  Graham still had not taken his NSAIDs as directed.  (*Id.* at ¶ 55).  PA-C Carey

completed a physical exam, which revealed full range of hip motion.  (*Id.* at ¶ 56).  PA-C

Carey observed that Graham was able to easily get on and off the exam table without

assistance.  (*Id.* at ¶ 57).  PA-C Carey also noted that Graham's 2016 x-ray was negative.

(*Id.* at ¶ 58).  Graham agreed to PA-C Carey's plan of care, which included Graham

complying with recreation restrictions and his NSAID regimen before an MRI could be

considered.  (*Id.* at ¶ 59).  PA-C Carey also prescribed prednisone and naproxen, with the

direction that over-the-counter NSAIDs should be obtained from the commissary once his

prescriptions were complete.  (*Id.* at ¶ 60).  PA-C Carey also ordered lab work, requested a

physical therapy consult, and offered Graham a cane, which he refused.  (*Id.* at ¶ 61).

Graham was prescribed to begin physical therapy on October 23, 2017, and he

attended his appointment on that date.  (*Id.* at ¶ 62).

On November 1, 2017, Graham engaged in an inmate-on-inmate fight, during which

pepper spray was deployed.  (*Id.* at ¶ 63).  Graham sustained minor swelling and

tenderness of his right hand during the fight.  (*Id.* at ¶ 64).  Graham was evaluated by EMTP

Kabonick that day and he did not complain of any hip pain.  (*Id.* at ¶ 66).  On November 17,

2017, Graham was placed in the Special Housing Unit ("SHU").  (*Id.* at ¶ 67).  Physical

therapy staff provided Graham with a home exercise program to continue while he was in

the SHU.  (*Id.* at ¶ 68).

During a medical encounter on December 7, 2017, PA-C Kaiser directed Graham to

notify Health Services if he still had hip pain after completing physical therapy.  (*Id.* at ¶ 69).

On December 19, 2017, Graham was involved in an altercation in the SHU that

involved the deployment of pepper spray.  (*Id.* at ¶ 70).  Graham did not sustain an injury

but was evaluated by medical staff that day.  (*Id.* at ¶ 71).  Graham did not complain of hip

pain during this evaluation and it was noted that he had a steady and normal gait.  (*Id.* at ¶

72).

On or about January 13, 2018, Graham injured a toe while playing basketball.  (*Id.* at

¶ 73).  The next day, he was evaluated by a paramedic.  (*Id.* at ¶ 74).  Graham denied any

hip pain during this evaluation.  (*Id.* at ¶ 75).  On January 15, 2018, PA-C Kaiser evaluated

Graham for the same toe pain.  (*Id.* at ¶ 76).  Graham did not complain of hip pain during

this evaluation.  (*Id.* at ¶ 77).  PA-C Kaiser diagnosed a localized toe infection and provided

an antibiotic injection.  (*Id.* at ¶ 78).  On January 16, 2018, PA-C Carey treated Graham in a

follow-up visit for the toe pain.  (*Id.* at ¶ 79).  Graham did not complain of hip pain during this

evaluation.  (*Id.* at ¶ 80).  On January 26, 2018, PA-C Carey again treated Graham in a

follow-up encounter for the toe pain.  (*Id.* at ¶ 81).  Graham denied pain during this

encounter but inquired about his "chronic hip issue."  (*Id.* at ¶ 82).  PA-C Carey reviewed

Graham's chart, which revealed that he had purchased ibuprofen only once in October and once in January, which demonstrated that he had not been taking the NSAIDs as directed. (*Id.* at ¶ 83).  PA-C Carey also noted that Graham had been noncompliant with recreation restrictions.  (*Id.* at ¶ 84).  PA-C Carey again advised Graham to comply with the NSAID course as directed and restrict his recreation before he could be considered for an MRI.  (*Id.* at ¶ 85).

Graham failed to show up for a scheduled sick-call appointment on April 13, 2018. (*Id.* at ¶ 86).

On June 15, 2018, Graham requested a sick call for multiple "infected bumps" on his legs.  (*Id.* at ¶ 87).  PA-C Carey performed an evaluation on that date and Graham did not complain of any hip pain.  (*Id.* at ¶¶ 88, 89).  PA-C Carey diagnosed localized skin infection and prescribed an antibiotic.  (*Id.* at ¶ 90).  At the end of the encounter, Graham asked about obtaining a hip MRI.  (*Id.* at ¶ 91).  PA-C Carey reviewed Graham's chart, which revealed he still had not been compliant with the NSAID regimen and had obtained ibuprofen only once in the past 5 months.  (*Id.* at ¶ 92).  PA-C Carey again advised Graham to follow the NSAID regimen and contact Health Services for additional workup after he did so.  (*Id.* at ¶ 93).  Graham failed to show up for a follow-up examination on June 28, 2018. (*Id.* at ¶ 94).

On July 11, 2018, PA-C Carey performed a follow up-examination.  (*Id.* at ¶ 95).  PA-C Carey noted the skin bumps had cleared and had not recurred.  (*Id.* at ¶ 96).  At the conclusion of the evaluation, Graham complained of chronic hip pain, which he rated as a 3/10.  (*Id.* at ¶ 97).  PA-C Carey re-reviewed the results of the 2016 x-ray with Graham.  (*Id.* at ¶ 98).  PA-C Carey reviewed Graham's chart and noted Graham had more than 5 recreational related injuries since his initial complaint of hip pain.  (*Id.* at ¶ 99).  PA-C Carey also noted that Graham reported relief from pain while taking NSAIDs and improvement following physical therapy.  (*Id.* at ¶¶ 100, 101).  PA-C Carey explained to Graham that, if he was able to control his pain with NSAIDs and participate fully in recreation, he did not meet the criteria for additional intervention and instructed Graham to fully comply with the treatment regimen prescribed.  (*Id.* at ¶ 102).

On October 17, 2018, PA-C Carey evaluated Graham for chronic hip pain.  (*Id.* at ¶ 103).  PA-C Carey prescribed work and recreation restrictions, advised Graham to continue his NSAID regimen, and placed a consult request for another physical therapy trial.  (*Id.* at ¶ 104).  PA-C Carey also ordered a new left hip x-ray to obtain clearance for an MRI.  (*Id.* at ¶ 105).

On October 26, 2018, Graham underwent a left hip x-ray which revealed no change from the 2016 x-ray.  (*Id.* at ¶¶ 106, 107).  On November 19, 2018, PA-C Carey advised Graham of the findings from the 2018 x-ray.  (*Id.* at ¶ 108).  Graham's physical therapy

consult remained outstanding as of the November 19, 2018 evaluation, and PA-C Carey

explained her plan to consult orthopedics if physical therapy did not yield improved results.

(*Id.* at ¶ 109).  PA-C Carey also ordered lab work, including a test for Rheumatoid Factor.

(*Id.* at ¶ 110).  PA-C Carey granted Graham's request to use crutches while the treatment

plan was in progress.  (*Id.* at ¶ 111).  While Graham was undergoing a course of physical

therapy, PA-C Carey provided Graham with ibuprofen on December 4, 2018, after Graham

reported being unable to obtain ibuprofen through the commissary.  (*Id.* at ¶ 112).

On December 11, 2018, Dr. Sommers ordered a left hip MRI, which was scheduled

for December 13, 2018.  (*Id.* at ¶ 113).  On December 13, 2018, before the MRI

commenced, Graham reported increased swelling in his hands and feet.  (*Id.* at ¶ 114).

Graham admitted that he had taken twelve 200 mg ibuprofen tablets before bed.  (*Id.* at ¶

115).  PA-C Walters evaluated Graham, expressed the dangers of high dose ibuprofen,

ordered lab work, discontinued ibuprofen, and prescribed Tylenol.  (*Id.* at ¶ 116).

Graham's November 19, 2018 lab work returned positive for an elevated

Rheumatoid Factor and sedimentation rate.  (*Id.* at ¶ 117).

On December 13, 2018, Graham underwent a left hip MRI.  (*Id.* at ¶ 118).  The

following day, December 14, 2018, Dr. Sommer discussed with Graham the lab results and

provisionally diagnosed Rheumatoid Arthritis, pending the results of the MRI.  (*Id.* at ¶ 119).

Also on that date, Dr. Sommer referred Graham for a rheumatology consult, prescribed prednisone and scheduled a follow-up appointment for December 19, 2018. (*Id.* at ¶ 120).

On December 19, 2018, Dr. Sommer reviewed the results of the hip MRI, which revealed osteoarthritis. (*Id.* at ¶ 121). Graham did not show for the follow-up appointment on December 19, 2018. (*Id.* at ¶ 122).

On December 21, 2018, PA-C Carey performed a follow-up evaluation during which Graham reported that the prednisone had "helped tremendously," which further supported the Rheumatoid Arthritis diagnosis. (*Id.* at ¶ 123). During this visit, Graham reported left knee pain, and PA-C Carey ordered a knee x-ray. (*Id.* at ¶ 124).

On December 28, 2018, PA-C Walters prescribed additional prednisone after Graham reported the medication had resulted in "dramatic improvement in pain and swelling" but had run out. (*Id.* at ¶ 125).

On January 12, 2019, Graham was evaluated by a non-party orthopedic surgeon, Dr. Mogerman, who diagnosed developmental dysplasia with osteoarthritis and a history of rheumatoid arthritis. (*Id.* at ¶ 126). Dr. Mogerman recommended treatment with meloxicam and scheduled a follow-up appointment. (*Id.* at ¶ 127). Dr. Mogerman also noted that Graham may be appropriate for a total hip replacement if conservative treatment was ineffective. (*Id.* at ¶ 128).

27

On January 14, 2019, Dr. Sommer refilled Graham's prednisone prescription.  (*Id.* at ¶ 129).  On January 16, 2019, Dr. Sommer examined Graham and Graham reported the prednisone had not significantly reduced his hip pain and his knee still hurt.  (*Id.* at ¶¶ 130, 131).  Dr. Sommer reviewed Dr. Mogerman's consult notes with Graham, prescribed prednisone, methotrexate, and folic acid, ordered additional lab work, requested another orthopedic surgery consult, and issued Graham a cane to assist in ambulation.  (*Id.* at ¶ 132).  Dr. Sommer also explained the process for obtaining a hip replacement, which included obtaining approval from the BOP Regional and Central Offices and can take several months.  (*Id.* at ¶ 133).

On January 25, 2019, Graham reported to Dr. Sommer that his hip pain was worsening.  (*Id.* at ¶ 134).  Dr. Sommer consulted the orthopedic surgeon for pain management suggestions.  (*Id.* at ¶ 135).  On February 5, 2019, Dr. Sommer increased Graham's methotrexate prescription.  (*Id.* at ¶ 136).

USP-Canaan is not equipped to provide aftercare for a patient undergoing a total hip replacement.  (*Id.* at ¶ 137).  Dr. Sommer requested that Graham be medically transferred to a facility that could provide appropriate aftercare following a total hip replacement, which was approved by the Warden on February 11, 2019.  (*Id.* at ¶ 138).  As a result of Dr. Sommer's request for medical transfer, Graham's care level was raised from "two" to "four."  (*Id.* at ¶ 139).  Care levels are assigned based upon the quantity and degree of specialty

care required and range up to level four, which indicates greatest care that generally

requires placement at a medical center.  (*Id.* at ¶ 140).

On February 14, 2019, Dr. Sommer increased Graham's prednisone prescription.

(*Id.* at ¶ 141).  On February 21, 2019, Dr. Sommer evaluated Graham because Graham

reported he still had hip and knee pain and requested medical shoes.  (*Id.* at ¶ 142).  Dr.

Sommer issued medical shoes and a knee sleeve, increased Graham's methotrexate

dosage, and placed a podiatry consult to evaluate Graham for possible leg length

discrepancy.  (*Id.* at ¶ 143).

On February 21, 2019, a registered nurse noted that staff had frequently observed

Graham playing basketball during recreation time, even though he was on a medical idle

and recreation restriction and had been issued a cane.  (*Id.* at ¶ 144).  The registered nurse

specifically noted that she witnessed Graham "actively participating playing basketball,

wearing basketball sneakers" and that Graham was "able to play, run up and down [the]

court without difficulty and without the use of a cane or any medical aid."  (*Id.* at ¶ 145).  The

registered nurse reminded Graham that he was not authorized to go to indoor or outdoor

recreation in the gym until cleared by his physician.  (*Id.* at ¶ 146).  On February 21, 2019,

Graham's cane was returned to medical "after it was left on the side of the basketball court

and [Graham] was found playing basketball."  (*Id.* at ¶ 147).

On February 24, 2019, orthopedic surgeon, Dr. Mogerman, again evaluated Graham and recommended that Graham undergo a hip replacement.  (*Id.* at ¶¶ 148, 149).  Dr. Mogerman also recommended meloxicam, an NSAID.  (*Id.* at ¶ 150).

On February 25, 2019, Dr. Sommer reviewed the orthopedic surgeon's note and noted that Graham could not simultaneously take prednisone and meloxicam.  (*Id.* at ¶ 151).

Graham did not show up for a lab draw on February 27, 2019.  (*Id.* at ¶ 152).

On March 11, 2019, PA-C Carey evaluated Graham for ongoing hip and knee pain.  (*Id.* at ¶ 153).  PA-C Carey again observed Graham getting "on and off the exam table easily and without obvious pain or need for assistance."  (*Id.* at ¶ 154).  PA-C Carey ordered naproxen, an NSAID, and indicated the meloxicam recommended by Dr. Mogerman would be ordered once Graham completed his course of naproxen and prednisone.  (*Id.* at ¶ 155).

On March 14, 2019, Dr. Sommer referred Graham to podiatry for evaluation of leg-length discrepancy.  (*Id.* at ¶ 156).

On March 25, 2019, Graham complained of knee pain and swelling without trauma.  (*Id.* at ¶ 157).  On that date, PA-C Carey reissued Graham a cane with express instructions that he must use it properly and not engage in physical recreation activities.  (*Id.* at ¶ 158).

On April 2, 2019, Dr. Ramos, a rheumatologist, evaluated Graham.  (*Id.* at ¶ 159).  Dr. Ramos administered an injection to Graham's left knee and scheduled a follow-up evaluation for May 7, 2019.  (*Id.* at ¶ 160).

On April 9, 2019, Graham's cane was confiscated after staff observed him "walking to/from [the dining] hall carrying his cane, but not touching it to the ground [or] bearing weight on it." (*Id.* at ¶ 161). Graham "got up and stormed out of the [Health Services Unit] waiting room without any issue or observed sign of pain," and PA-C Carey noted that Graham was able to ambulate easily and without the need for assistance or demonstrating a favoring or guarded gait. (*Id.* at ¶ 162).

On April 10, 2019, Graham reported he bruised his elbow after falling in the shower. (*Id.* at ¶ 163). An examination on that date revealed only minor swelling and an "old scar to the [left] elbow area," which Graham explained was from a burn many years ago. (*Id.* at ¶ 164). Staff ordered an elbow x-ray, but Graham left the Health Services unit before the x-ray was completed. (*Id.* at ¶ 165).

Graham failed to show up for lab work ordered by rheumatologist Dr. Ramos on April 15, 2019. (*Id.* at ¶ 166).

On Mary 13, 2019, Graham's transfer for a hip replacement was approved by the Regional Office. (*Id.* at ¶ 167).

Graham failed to show up for two scheduled lab draws on May 16, 2019 and August 7, 2019. (*Id.* at ¶¶ 168, 169).

On August 29, 2019, rheumatologist Dr. Ramos evaluated Graham and noted marked improvement and recommended continuing Graham's prescribed medication. (*Id.*

at ¶¶ 170, 171).  Dr. Ramos also noted that Graham would likely need a total hip

replacement and might benefit from physical therapy.  (*Id.* at ¶ 172).

On August 29, 2019, Dr. Mowatt ordered lab work, and on September 22, 2019, Dr.

Sommer ordered lab work.  (*Id.* at ¶¶ 173, 174).

On October 3, 2019, the BOP Central Office denied Graham's transfer for a total hip

replacement because Graham's projected release date was only 7 months away, making it

uncertain that the procedure and follow-up could be appropriately completed prior to his

release.  (*Id.* at ¶ 175).  As a result, Dr. Mowatt returned Graham to care level 2 status.  (*Id.*

at ¶ 176).

On November 25, 2019, PA-C Walters renewed Graham's medications.  (*Id.* at ¶

177).

On December 5, 2019, Dr. Mowatt evaluated Graham, reviewed his chart, and noted

that Graham was getting reasonable relief from the medications, and discussed switching

Graham to meloxicam.  (*Id.* at ¶¶ 178, 179).  Graham declined the medication change and

expressed his preference to use acetaminophen.  (*Id.* at ¶ 180).

On January 2, 2020, PA-C Walters evaluated Graham.  (*Id.* at ¶ 181).  Graham

complained of continued intermittent pain.  (*Id.* at ¶ 182).  Graham decided to continue

acetaminophen as needed for pain and would seek treatment from a rheumatologist when

released.  (*Id.* at ¶ 183).

On January 31, 2020, rheumatologist Dr. Ramos evaluated Graham and Graham reported that his pain improved with medications.  (*Id.* ¶¶ at 184, 185).  Dr. Ramos recommended continuing his medications and lab work monitoring.  (*Id.*).  On February 4, 2020, Health Services staff continued Graham's medications.  (*Id.* at ¶ 186).

Graham denied pain or other complaints on April 29, 2020, May 2, 2020, May 3, 2020, and May 4, 2020.  (*Id.* at ¶ 187).  On May 5, 2020, Graham was transferred from USP-Canaan.  (*Id.*).  On June 9, 2020, Graham was released from custody.  (*Id.*).

Graham has a degenerative disease that was treated with repeated evaluations, pain management, physical therapy, and specialty consultations.  (*Id.* at ¶ 188).  Graham's acetabular dysplasia is a congenital/developmental abnormality caused by a shallow hip socket that can, over many years, cause the joint to wear irregularly and can result in osteoarthritis.  (*Id.* at ¶ 189).  The 2016 x-ray and the 2018 x-ray did not reveal osteoarthritis.  (*Id.* at ¶ 190).  Osteoarthritis is not a severe medical condition and Graham did not have a serious medical condition.  (*Id.* at ¶¶ 191, 192).  The medical providers timely and reasonably diagnosed osteoarthritis and Graham's osteoarthritis was in the early to mid-stages of the disease.  (*Id.* at ¶¶ 193, 194).  There is no cure for osteoarthritis.  (*Id.* at ¶ 195).  It is reasonable for medical providers to treat symptoms secondary to osteoarthritis with medications, such as NSAIDs.  (*Id.* at ¶ 196).  Graham experienced relief with medication and assistive devices for his osteoarthritis.  (*Id.* at ¶ 197).  The standard of care

33

for the treatment of osteoarthritis is to treat the incurable process with the least invasive treatment, which includes NSAIDs, movement restrictions, and physical therapy. (*Id.* at ¶ 198). The standard of care does not require a total hip replacement for Graham's medical conditions. (*Id.* at ¶ 199). The treatment provided to Graham was reasonable for the diagnosis of dysplasia, osteoarthritis, and rheumatoid arthritis. (*Id.* at ¶ 200).

Graham was repeatedly noncompliant with recommended treatment and restrictions and failed to present for scheduled appointments and lab draws. (*Id.* at ¶ 201). Despite Graham's repeated noncompliance, the medical staff at USP-Canaan, including Dr. Sommer, Dr. Mowatt, PA-C Kaiser, PA-C Rhea, and PA-C Walters, continued to manage his pain and effect a reasonable course of treatment as clinically indicated. (*Id.* at ¶ 202).

Standard practice after a total hip replacement is to follow the patient closely for the first year after surgery because multiple complications can occur during this time. (*Id.* at ¶ 203). The decision to cancel the total hip replacement until Graham could have adequate follow-up care was the right and prudent decision. (*Id.* at ¶ 204).

Dr. Sommer, Dr. Mowatt, PA-C Kaiser, PA-C Rhea, and PA-C Walters each met the standard of care. (*Id.* at ¶¶ 205-209). The medical staff who provided care to Graham were not negligent or indifferent to his medical condition. (*Id.* at ¶ 210).

C.      Discussion

Graham asserts that Dr. Sommer, Dr. Mowatt, PA-C Carey, PA-C Walters, and PA-C

Kaiser were deliberately indifferent to his serious medical needs, in violation of the Eighth

Amendment, for failing to adequately treat his hip condition.  (*See* Doc. 1).  Defendants

move for summary judgment on this Eighth Amendment medical care claim.  (Doc. 25, pp.

23-37).

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on

prisoners.  *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000).  In the context of medical

care, the Eighth Amendment "requires prison officials to provide basic medical treatment to

those whom it has incarcerated."  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  To

establish an Eighth Amendment claim based on a prison's denial of medical care, an inmate

must allege acts or omissions by prison officials that were sufficiently harmful to establish

deliberate indifference to a serious medical need.  *See Spruill*, 372 F.3d at 235; *Natale v.*

*Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).  The relevant inquiry is

whether the defendant: (1) was subjectively deliberately indifferent (2) to the plaintiff's

objectively serious medical needs.  *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994);

*Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 226 (3d Cir. 2015).

The "deliberate indifference" prong of the applicable Eighth Amendment analysis

requires that the defendant actually know of and disregard "an excessive risk to inmate

health or safety." *Farmer*, 511 U.S. at 837.   Circumstantial evidence can establish

subjective knowledge on the part of the defendant if it shows that the excessive risk was so

obvious that the official must have known about it.   *See Beers-Capitol v. Whetzel*, 256 F.3d

120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 842).   The Third Circuit has found

deliberate indifference when a prison official: "(1) knows of a prisoner's need for medical

treatment but intentionally refuses to provide it; (2) delays necessary medical treatment

based on a non-medical reason; or (3) prevents a prisoner from receiving needed or

recommended medical treatment."   *Rouse*, 182 F.3d at 197.

The second prong of the Eighth Amendment inquiry is whether the plaintiff's medical

needs were serious.   A serious medical need is "one that has been diagnosed by a

physician as requiring treatment or one that is so obvious that a lay person would easily

recognize the necessity for a doctor's attention."   *Monmouth Cty. Corr. Inst. Inmates v.

Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).   Not every condition is a serious medical need;

instead, the serious medical need element contemplates a condition of urgency, namely,

one that may produce death, degeneration, or extreme pain.   *See id.*

Moreover, because only egregious acts or omissions can violate this standard, mere

medical malpractice cannot result in an Eighth Amendment violation.   *White v. Napoleon*,

897 F.2d 103, 108-10 (3d Cir. 1990); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("[M]edical

malpractice does not become a constitutional violation merely because the victim is a

prisoner.").  The Supreme Court has held that negligence or inadvertence alone do not rise to the level of a constitutional violation.  *Whitley v. Albers*, 475 U.S. 312 (1986).  The Supreme Court has also noted that "[l]ack of due care suggests no more than a failure to measure up to the conduct of a reasonable person."  *Daniels v. Williams*, 474 U.S. 327, 332 (1986).  Where a state of mind is relevant, the complaint is inadequate if it merely contains conclusory allegations describing the requisite state of mind such as "intentionally" or "recklessly" without supporting factual allegations.  *Wilson v. Seiter*, 501 U.S. 294 (1991).

Prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients, *see Young v. Kazmerski*, 266 F. App'x 191, 194 (3d Cir. 2008), and a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment.  *See White*, 897 F.2d at 108-10.  Furthermore, it is well-settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim.  *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); *Pearson v. Prison Health Servs.*, 850 F.3d 528, 535 (3d Cir. 2017) ("[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care.").

The undisputed evidence establishes that Graham received extensive medical treatment for his hip, as outlined above.  Graham underwent a left hip x-ray in October 2016 which revealed "slight left-sided acetabular dysplasia [with] minimal joint space narrowing." (Doc. 24 ¶ 26).  In October 2019, Graham underwent another left hip x-ray which was stable and revealed no change from the 2016 x-ray.  (*Id.* at ¶ 107).  A left hip MRI was conducted on December 13, 2018 which revealed osteoarthritis and decrease in the left femoral head/neck offset.  (*Id.* at ¶¶ 121,190).  Graham was consistently treated with medications and physical therapy, he was issued a cane to assist with ambulation, he was placed on activity restrictions, and referred to specialists.  An orthopedic surgeon treated Graham and diagnosed developmental dysplasia with osteoarthritis and initially recommended medication and a hip replacement if medication was ineffective, and subsequently recommended a hip replacement.  (*Id.* at ¶¶ 126-128, 149).  After evaluating Graham's condition, Dr. Sommer placed a request for medical transfer because USP-Canaan is not capable of providing appropriate medical treatment after a hip replacement.  (*Id.* at ¶ 138). The BOP Regional Office approved Graham's transfer for a hip replacement, but the BOP Central Office later denied the transfer request due to Graham's upcoming release date. (*Id.* at ¶¶ 167, 175).  The record also reflects that Graham continued to engage in various physical activities despite his activity restrictions, and had his cane confiscated because he left it on the side of the basketball court, and he was ambulating without the cane and

without any observed pain. (*Id.* at ¶¶ 73, 144-147, 161, 162). Moreover, Graham denied experiencing any hip pain on numerous occasions, he refused to comply with his medication treatment plan for quite some time, refused to adhere to his recreation restrictions, and failed to show up for scheduled medical appointments and lab draws. (*Id.* at ¶¶ 75-77, 79, 80, 83-85, 201).

The record reflects that Graham was promptly and properly treated for his hip condition. There is no evidence that Defendants wholly refused to provide any medical care. Instead, Graham's claims amount to, at most, a disagreement with his medical treatment decisions. The Third Circuit has repeatedly held, however, that prisoners are not entitled to convert such dissatisfaction into a constitutional claim, and courts will not second guess whether a particular course of treatment is adequate or proper. *See Spruill*, 372 F.3d at 235 (holding that "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation); *Norris v. Frame*, 585 F.2d 1183, 1186 (3d Cir. 1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim."). Moreover, Graham failed to present evidence that any of the Defendants' actions were based on an ulterior motive beyond providing routine patient care. *See Spruill*, 372 F.3d at 237 (noting that in order to state a deliberate indifference claim, a plaintiff should in some way "connect[ ] his factual allegations to the alleged mental states" of the defendants).

In light of the undisputed facts and relevant evidence of record, the Court concludes that Graham has failed to produce any evidence to overcome Defendants' summary judgment motion, and cannot merely rely on unsupported assertions, inferences based upon a speculation or conjecture, or unverified, conclusory allegations.  Under Rule 56, Graham was required to go beyond his pleadings with affidavits or the like in order to establish the existence of a genuine dispute of material fact.  *See Celotex Corp.*, 477 U.S. at 324.  Because he has failed to do so, and because Graham received considerable treatment while housed at USP-Canaan, the Court will enter judgment in favor of Dr. Sommer, Dr. Mowatt, PA-C Carey, PA-C Walters, and PA-C Kaiser on the Eighth Amendment claim.

## IV.    Conclusion

Based on the foregoing, Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and for summary judgment pursuant to Federal Rule of Civil Procedure 56, will be granted.  (Doc. 20).

A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: March ___, 2021

40